IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| HARBOR COMMUNICATIONS, LLC, *et al.*, )<br>    Plaintiffs, )<br>     )<br>v. )<br>     )<br>SOUTHERN LIGHT, LLC, *et al.*, )<br>    Defendants. ) | CIVIL ACTION: 1:18-00111-KD-N |

**ORDER**

This matter is before the Court on Defendants' motion for summary judgment (Doc. 46), Plaintiffs' Response (Doc. 48) and Defendants' Reply (Doc. 51). The motion is **DENIED**, except as otherwise indicated herein regarding damages.

This case involves Plaintiffs Harbor Communications, LLC, Boihem Investment Company, LLC, and J&L, LLC (Plaintiffs collectively / individually Harbor, Boihem, J&L), and Defendants Southern Light, LLC (Southern Light) and Uniti Fiber Holdings, Inc., (Uniti). On February 3, 2018, Plaintiffs initiated a state court litigation against Southern Light and Uniti in the Circuit Court of Baldwin County, Alabama (05-CV-2018-900143.00) alleging breach of the 2016 settlement agreement (the contract) related to resolution of a prior state court case (CV-2013-900392). (Doc. 1-1). Plaintiffs seek damages including costs and attorneys' fees.

On March 9, 2018, Defendants removed the case to this Court on the basis of federal diversity subject matter jurisdiction. Subsequently, Defendants filed an answer and Southern Light asserted a counterclaim against Harbor for breach of contract. (Docs. 2, 5 (amended)). Southern Light seeks damages from Harbor including interest, costs, and reasonable attorneys' fees.

I.      **<u>Breach of Contract Claim & Counterclaim</u>**[1]

Plaintiffs' breach of contract claims are rooted primarily in the alleged failure of Southern Light to "properly build out" the seven (7) COs -- to leave or create space to accommodate a MUX in the buildout Southern Light performed. Plaintiffs specify the following "non-exhaustive list of the ways" the Defendants breached:

> (a) Defendants failed to timely transfer to Harbor certain equipment located in seven COs in Mobile and Baldwin Counties. Defendants failed to consult and work together with Harbor to facilitate the buildout and transfer. Defendants failed to pay for and build the new rack space which was required to facilitate the transfer of all such equipment to Harbor.
>
> (b) Defendants failed to pay all costs and fees (including certain fees owed to AT&T) arising as part of the transfer and buildout.[2]
>
> (c) Defendants failed to perform the transfer and buildout "as soon as [could] be reasonably coordinated" after the execution of the parties' settlement agreement in December of 2016. The work required by the settlement agreement should have been completed on or before June of 2017.
>
> (d) Throughout 2017, Southern Light demonstrated a general lack of diligence in regard to performance of its obligations under the settlement agreement. In or around September of 2017, Southern Light repudiated the settlement agreement by stating that it was not obligated to perform its terms. Specifically, Southern Light has refused to complete the transfer and buildout contemplated by Paragraph 3 of the settlement agreement.
>
> (e) Defendants breached the settlement agreement by failing to give Harbor a ten percent discount below its real wholesale pricing on certain services.

---

[1] As this is a diversity case, this Court applies the choice of law principles of Alabama, the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941); *St. Paul Fire and Marine Ins. Co. v. ERA Oxford Realty Co. Greystone, LLC*, 572 F.3d 893, 895 n.1 (11th Cir. 2009) (citation omitted). For contract disputes, the law of the state where the contract was formed applies unless the contract contains a governing law provision. *Cherokee Ins. Co. v. Sanches*, 975 So.2d 287, 292 (Ala. 2007). Neither the Settlement Agreement nor Fiber Agreement contain a choice of law provision. The Release and Master Services Agreement select Alabama. Given the parties' briefing of Alabama law, and upon consideration of these choice of law provisions and the fact that the settlement agreement appears to have been formed in Alabama and concerns colocation space/services in Alabama, the Court applies Alabama law.

[2] Harbor has conceded this claim. (Doc. 48-1 at 7).

> (f) Harbor has approximately 600 voice line customers being serviced out of the seven COs affected by the settlement agreement. 370 of those lines are connected to equipment in four of the COs to which Harbor lacks direct access. The Defendants' failure to perform under the settlement agreement restricts Harbor's access to this equipment. In the event Harbor's equipment in these COs is in need of service, Harbor is unable to access it. The revenue stream which is put in jeopardy by this lack of access is approximately $290,000.00 per year.
>
> (g) Southern Light failed to provide Harbor with 6 strands of dark fiber between all 8 of the COs in Mobile and Baldwin Counties for Harbor's use.

(Doc. 1-1 at 7). Plaintiffs also allege a "non-exhaustive list" of damages stemming from the breach. (Id. at 8-9).

Defendants respond that Harbor -- unilaterally and mistakenly -- assumed Southern Light would leave space for a MUX while never making it a settlement agreement (contract) term. Also, Southern Light counterclaims that "Harbor's refusal to accept colocation space under the terms of the settlement agreement constitutes a breach[,]" which has damaged Southern Light. (Doc. 5 at 4).

Plaintiffs attempt to rebut Defendants stance by asserting that it is common knowledge a MUX would be required, even if not specified in the contract. Plaintiffs argue that the implied covenant of good faith and fair dealing supports their claims. For same, Plaintiffs argue a MUX space was essential to the contract -- an impliedly known or understood necessity for carrying out the purpose for which the contract was made, such that its rejection of the buildout is excused due to Southern Light's non-performance (failure to leave/accommodate for MUX space). See, e.g., Lloyd Noland Fdn., Inc. v. City of Fairfield Healthcare Auth., 837 So.2d 253, 267 (Ala. 2002) (when a contract fails to specify an obligation intended to be assumed, the law implies an agreement for that obligation -- "that according to reason and justice the parties should do…to carry out the purpose for which the contract was made[]"). In sum, Plaintiffs claim the need for

3

MUX space was a known or understood obligation among the parties to implement the buildout (as necessary to make things work), and that Southern Light's failure to meet this obligation (by not leaving MUX space and failing to use best efforts to remedy this) is the breach for which they seek to recover damages.

Defendants respond that industry practice/knowledge requires *precise* rack design -- i.e., that telecommunication companies do not make assumptions for other entities about rack space and require *exact* disclosure (diagrams/specs). Thus, rack space for a MUX is not an implied term of the agreement.

The Court finds that there are issues of material fact regarding the claims made by each party. Specifically, whether MUX space was an impliedly known or understood necessity for carrying out the purpose for which the contract was made must be resolved by a factfinder. However, as to available damages for each claimed breach, the Court makes the following findings of fact and conclusions of law.

## II.    Findings of Fact

Pertinent to the settlement -- and the current dispute arising from same -- are four (4) documents executed by the parties: 1) the Settlement and Services Agreement (SSA - Doc. 48-1 at 2-14), 2) the Mutual Release which incorporates the SSA (Release - Doc. 48-1 at 108-115), 3) the Optical Fiber IRU Agreement (IRU - Doc. 48-1 at 16-50), and 4) the Master Services Agreement (MSA - Doc. 48-1 at 52-68). The SSA specifies that the MSA and the IRU, together with the SSA, "shall constitute the entire relationship between the parties. Any and all prior agreements….are…terminated." (Doc. 48-1 at 3-4 at ¶6).

By incorporation, the SSA is part of the Release: "The Settlement and Services Agreement is hereby adopted and incorporated as if set forth fully herein." (Doc. 48-1 at 109 at ¶2). Regarding damages, the Release provides: "NO PARTY TO THIS AGREEMENT SHALL BE LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES." (Doc. 48-1 at 110 at ¶9) (emphasis in the original).[3]

Harbor argues that the Release covers claims in the prior litigation and does not speak to anything in the future concerning the parties' obligations (arising after the effective date of the Release). As such, Harbor argues that this limitation on damages in the Release is inapplicable to the current claims of breach of the SSA. The Court finds that adopting Harbor's interpretation would make the limitation provision nonsensical. Earlier in the Release, the parties released each other from "any and all…damages" and "liabilities of any kind" arising from the prior claims. (Doc. 48-1 at 109). Logically the more narrow limitation of liability provision (which does not exclude "liabilities of any kind" or "any and all damages"), found later in the Release, would not apply to prior claims. Thus, the provision could only be construed to apply to future claims related any alleged breach of the incorporated SSA.

As to Harbor's allegations related to Southern Light's obligation to build out racks (delineated above as claims (a), (c), (d) and (f)), and Southern Light's counterclaim, paragraph 3 of the SSA governs and sets forth:

> 3. <u>Central Office Colocation</u>.  SL shall, as soon as can be reasonably coordinated, transfer to Harbor any relay racks that contain exclusively Harbor owned equipment, as highlighted in yellow on Exhibit A in the following COs: Azalea; Airport; Fairhope; Old Shell; Skyline; Spanish Fort; Springhill. In these

---

[3] The SSA also provides that "in the event either party takes action to enforce any of its right under this Agreement…the non-prevailing party shall pay all costs and expenses…including, without limitation, reasonable attorney's fees, expenses, and any other costs of litigation. (Doc. 48-1 at 5 at ¶12).

> central offices for racks where Harbor and SL equipment is commingled, the parties will work together to transition Harbor's equipment into stand-alone racks (either existing or new) that can be transitioned to Harbor. ln addition, Southern Light shall pay for the cost and manage the build out of new space and/or augment existing space for transfer to Harbor in the following central office locations as follows: Azalea (168 T-1/124 fiber CFAs and associated panels); Airport (168 T-1/24 fiber CFAs and associated panels); Fairhope (168 T-1/24 fiber CFAs and associated panels); Old Shell (168 T-1/24 fiber CFA's and associated panels); Skyline (168 T-J/24 fiber CFA's and associated panels); Springhill (168 T-1/24 Fiber CFAs) ; Spanish Fort (168 T-J s/24 fiber CFAs). In each of the above COs, Southern Light will provide to Harbor at least one rack equipped with 60 amps of dual feed electrical service…..

(Doc. 48-1 at 2-3 at ¶3).

The SSA further requires that within 20 days of the execution of the SSA, the parties shall enter into a 20 year IRU agreement. (Doc. 48-1 at 3 at ¶4). The SSA specifies that the "IRU [Indefeasible Right of Use] shall provide Harbor with 6 strands of fiber…." (Id.) The parties complied with these terms of the SSA in that they entered into a 20 year IRU agreement which provided that Southern Light would grant Harbor 6 strands of fiber.

The IRU encompasses the details regarding Harbor's use of certain Southern Light's dark fibers and associated property. And, as required by the SSA, included a provision to provide 6 stands of fiber to Harbor. Accordingly, Harbor's claim that Southern Light has failed to provide 6 strands of fiber (delineated above as claim (g)) is governed by the IRU, not the SSA. Regarding damages for failure to perform under the IRU, the contract contains a lengthy limitation of liability clause:

> "Notwithstanding any provision of this Agreement to the contrary, ***neither party shall be liable to the other party for any special, incidental, indirect, punitive or consequential damages***, whether foreseeable or not, ***arising out of, or in connection with such party's failure to perform its respective obligations*** hereunder***, including, but not limited to, loss of profits or revenue*** (whether arising out of transmission interruptions or problems, any interruption or degradation of service or otherwise), or claims of customers, whether occasioned by any construction, reconstruction, relocation, repair or maintenance

6

> performed by, or failed to be performed by, the other party ***or any other cause whatsoever, including breach of contract,*** breach of warranty, negligence, or strict liability, ***all claims for which damages are hereby specifically waived….In no event shall Grantor be liable to Grantee for any <u>direct</u> injury, loss or <u>damages</u> arising out of or resulting from any cause whatsoever to the extent such damages are in excess of the total amount of fees received from Grantee pursuant to this Agreement.***"

(Doc. 48-1 28 at Art. 14 (emphasis added)). Southern Light asserts that Harbor paid $0.00 in fees to Southern Light. (Doc. 46 at 17 (citing Doc. 1-1 at 34 at 3.01 and Doc. 1-1 at 32 at 1.20)). This is not disputed by Harbor.

The SSA also requires that within 20 days of the execution of the SSA, "the parties shall enter into a new, standard Master Services Agreement which shall be SL's standard Master Services Agreement, but shall also provide Harbor with a 10% discount on SL's listed wholesale pricing." (Doc. 48-1 at 3 at ¶5). The parties entered into an MSA. As written, the SSA required that the MSA include a term that would provide Harbor with a 10% discount. However, the written MSA did not so provide. Accordingly, the SSA is the only written document that governs any claim that Southern Light failed to provide the negotiated 10% discount to Harbor.

### III.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Rule 56(c) provides as follows:

> *(c) Procedures*
> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> ***(2) Objection That a Fact Is Not Supported by Admissible Evidence.*** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> ***(3) Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.
>
> ***(4) Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c).

The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992).

IV.     **Breach of Contract Damages**[4]

Generally, Harbor alleges that Southern Light's failure to implement the build-out of the seven (7) COs (via MUX space) caused unnecessary expenses, lost profits/customers, and a variety of other damages.

As to claim (f), revenue stream put in danger because of lack of access to the COs, Harbor admits that it has not suffered actual damages (no direct damages): "[t]he lack of actual damages does not obviate the fact that SL/Uniti's failure to deliver the central offices in a timely fashion constitutes a breach of the SA from which damages could arise." (Doc. 48 at 10).

However, as to claims (a) (failed to timely transfer equipment and build rack space), (c) (failed to timely perform the transfer and buildout), (d) (failed to complete the transfer and buildout), (e) (failed to give a 10% discount), and (g) (failed to provide dark fiber), Harbor contends it is seeking the recovery of direct compensatory damage, not special, indirect, incidental or consequential damages. From this, Harbor lists damages of **$227,680/year** as follows:

- $47,100/year for the $3,925/month Harbor pays Uniti for T-1s that could be converted;
- $17,640 for 14 additional T-1s that go to the University of Southern Alabama;
- $34,440 in lost revenue for contracts undersold by Uniti;
- $28,500 unfair competition (for pricing down expected revenues); and
- $100,000/year in lost revenue potential (inability to target potential customers- lost opportunity).

(Doc. 48 at 13-14). Additionally, Harbor asserts compensatory damages for the lost sale of the company to CSpire, which it asserts the jury should determine. (Id. at 14-15).

---

[4] Per Harbor, the other plaintiffs do not seek separate compensatory damages as a derivative claim or otherwise: "any and all damages to be recovered in this action are to be recovered by Harbor alone." (Doc. 48 at 15). Harbor only seeks "prompt and complete performance" for the other plaintiffs BIC and J&L.

9

The contractual terms regarding damages -- including the waiver of damages and limitations of liability clauses -- are clear and unambiguous. The Court does not find Harbor's contention that the SSA contains latent ambiguities (that the clear language suggests a single meaning, but extrinsic facts or extraneous evidence create a need for interpreting/choosing among two or more possible meanings) persuasive. (Doc. 48 at 15-16). As explained by this Court in Sloan v. Cunningham, 2017 WL 5894541, *8 (S.D. Ala. Nov. 29, 2017):

> "If the court determines that the terms [of the contract] are unambiguous (susceptible of only one reasonable meaning), then the court will presume that the parties intended what they stated and will enforce the contract as written." Cavalier Mfg., Inc., 862 So. 2d at 640 (quoting Homes of Legend, Inc. v. McCollough, 776 So. 2d 741, 746 (Ala. 2000)). Pursuant to Alabama law, construal of unambiguous agreements properly falls within the court's purview. Steward v. Champion Int'l Corp., 987 F.2d 732, 734 (11th Cir. 1993) (citing Terry Cove North, Inc. v. Baldwin County Sewer Auth., Inc., 480 So.2d 1171, 1173 (Ala. 1985)). See also Warrior Drilling & Eng'g Co. v. King, 446 So.2d 31, 33 (Ala. 1984) ("With regard to the construction of instruments, this court has said that if an instrument is unambiguous, its construction and effect are questions of law.").

Moreover, "Alabama law recognizes the freedom to contract and upholds 'clearly manifested limitations' in a contract, ….. See Campbell v. S. Roof Deck Applicators, Inc., 406 So.2d 910, 913 (Ala. 1981)." Standifer v. Best Buy Stores, L.P., 364 F.Supp.3d 1286, 1295 (N.D. Ala. 2019). As illustrated in Standifer, with regard to whether a party contractually agreed to waive damages and/or limit liability, the question of ambiguity rests with the trial judge:

> Paragraph 9 of the agreement's terms and conditions provided that Standifer agreed to "[w]aive any consequential or incidental damages against Geek Squad as a result of this service."…The Data Services Agreement also includes a limitation of liability clause, which provided that "[in] no event will Geek Squad be liable for any indirect damages whatsoever.…the total liability of Geek Squad to Client under this Agreement [sh]all in no event exceed the total sums paid by Client to Geek Squad." ….
>
> Standifer….argues…..that the consequential and incidental damages waiver does not apply to her claims. While Standifer's interpretation of the consequential and incidental damages waiver may be correct, this argument ignores the….limitation of liability clause. That clause provides that "the total liability of Geek Squad to client under this Agreement [sh]all

10

>in no event exceed the total sums paid by Client to Geek Squad." (*Id.* at 76.) The Court finds this provision to be unambiguous. See Nunnelley v. GE Capital Info. Tech. Solutions-North America, 730 So.2d 238, 241 (Ala. Civ. App. 1999) ("Whether a contract is ambiguous is a question of law for the trial judge."). It limits Standifer's ability to recover damages for breach of the Data Services Agreement to the $557.24 that she paid for Best Buy's services…..she is not entitled to recover any additional damages under the Data Services Agreement. Therefore, Best Buy is entitled to summary judgment on Standifer's breach of contract claim…..

Standifer, 364 F.Supp.3d at 1295-1296 (footnote omitted).  Further, as noted in Colonial Bancgroup Inc. v. PricewaterhouseCoopers, LLP, 2016 WL 9686250, *8 (M.D. Ala. Aug. 25, 2016):

>…Contract provisions that bar consequential damages….are fully enforceable in Alabama …. Saia Food Distribs. v. SecurityLink, 902 So. 2d 46, 50, 55 (Ala 2004) (enforcing a limit of liability clause as to damages arising from alleged breach of contract and negligence); Puckett, Taul & Underwood, Inc. v. Schreiber Corp., 551 So. 2d 979, 982-82 (Ala. 1989) (…commercial parties may contract freely to limit the remedies available to them;….).
>
>Nor is the damage limitation provision against Alabama public policy...The Alabama Supreme Court made this distinction clear over a decade ago: "[i]n *Morgan*, this Court addressed exculpatory clauses," which "'reliev[e] a party from liability.'" Fox Alarm Co. v. Wadsworth, 913 So. 2d 1070, 1076 (Ala. 2005). "At issue in this case, however, is a limitation-of-liability clause, not an exculpatory clause. Thus, [plaintiff's] reliance on *Morgan* is misplaced." Id. at 1076-77 (holding that the limitation-of-liability clause found in the contract is enforceable).

The Release/SSA clearly provides: "[t]he Settlement and Services Agreement is hereby adopted and incorporated as if set forth fully herein[]" and that "NO PARTY TO THIS AGREEMENT SHALL BE LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES."  Accordingly, as for claims (a), (c), (d), (e) and (f) which are governed by the SSA, damages are limited to direct compensatory damages.

It is clear that Harbor cannot recover damages for lost profits or lost opportunities, as such are not direct compensatory damages.  In McMillian v. FDIC, the Eleventh Circuit stated that:

11

> "Compensatory damages" are defined as those damages that "will compensate the injured party for the injury sustained, and nothing more; such as will simply make good or replace the loss caused by the wrong or injury." Black's Law Dictionary (6th Ed.1991). "Actual damages," roughly synonymous with compensatory damages, are defined as "[r]eal, substantial and just damages, or the amount awarded to a complainant in compensation for his actual and real loss or injury, as opposed...to 'nominal' damages [and] 'punitive' damages." *Id.* Finally, "[d]irect damages are such as follow immediately upon the act done." *Id.* Thus, "actual direct compensatory damages" appear to include those damages, flowing directly from the repudiation, which make one whole, as opposed to those which go farther by including future contingencies such as lost profits and opportunities or damages based on speculation…..

McMillian v. F.D.I.C., 81 F.3d 1041, 1055 (11th Cir. 1996) (footnote omitted).

Moreover, the alleged loss profits and lost opportunity do not flow directly from the failure to timely provide the COs. As the Eleventh Circuit explained in Silverpop Sys., Inc. v. Leading Market Tech., Inc., 641 Fed. Appx. 849, 855-856 (11th Cir. 2016) (footnote omitted):

> "The general rule applicable here is that damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach [i.e., general damages] and such as the parties contemplated, when the contract was made, as the probable result of its breach [i.e., consequential damages]." *Denny v. Nutt,* 189 Ga.App. 387, 388, 375 S.E.2d 878, 879 (1988) (internal quotation marks omitted) (alternations [sic] in original). So stated, however, the rule does little to further one's understanding of the type of damages that may "arise naturally from the contract" as opposed to the type that may be the "probable result of the breach." The Court finds it helpful to consider general (i.e., direct) damages as those damages that compensate for "the value of the very performance promised" and consequential damages as those damages that "seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach." *Schonfeld v. Hilliard,* 218 F.3d 164, 175–76 (2d Cir.2000) (internal quotation marks omitted). *See also Imaging Sys. Int'l, Inc. v. Magnetic Resonance Plus, Inc.,* 227 Ga.App. 641, 646, 490 S.E.2d 124, 129 (1997) (direct damages included loss of the benefit of the bargain).

The claim (g), that Southern Light has failed to provide Harbor with 6 strands of dark fiber, is governed by the IRU not the terms of the SSA/Release. See *supra*. The IRU includes a limitation of liability clause that unambiguously states that neither party shall be liable for any special, incidental, indirect, punitive or consequential damages (including lost profits, breach of

12

contract, etc.), and that *in no event* would damages be recoverable for any direct injury, loss or damages in excess of the fees received. (Doc. 48-1 28 at Art. 14)). Harbor paid $0.00 in fees to Southern Light. As such, the Court finds that Harbor is unable to recover for any damages for the alleged breach of the IRU. In other words, Harbor's only recourse for claim (g) appears to be a demand for specific performance.

V.     **Conclusion**

It appears that the claimed damages of $47,100 per year and $17,640 per year for expenses incurred due to the alleged failure of Southern Light to build out the Central Offices could be a direct damage from the alleged breach of the contract. Moreover, the difference in the price Harbor paid and the price had they received the 10 % discount, could also be direct compensatory damage. Accordingly, Harbor may submit evidence of these damages to the jury.

However, the specific damage claims for lost revenue ($34,440 per year for contracts undersold by Uniti), unfair competition ($28,500 per year), lost profits/lost opportunity to target potential customers ($100,000), and the lost sale of the company to CSpire, are consequential damages. Per the SSA/Release, Harbor has waived any consequential damages in the event that Southern Light failed to perform under the SSA. Accordingly, these alleged damages will not be considered by the jury.

The motion for summary judgment is otherwise **DENIED.**

**DONE** and **ORDERED** this the **9th** day of **September 2019.**

/s/Kristi K. DuBose
**KRISTI K. DuBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**